UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JOHN SAWYER, as next of kin of JACK SAWYER, | )<br>)<br>) Case No. 1:20-cv-153 |
| *Plaintiff*, | )<br>) Judge Travis R. McDonough<br>) |
| v. | ) Magistrate Judge Susan K. Lee<br>) |
| CITY OF SODDY-DAISY, ERIC JENKINS, MATTHEW THOMAS, and ERIC HINDMON, in their individual and official capacities, | )<br>)<br>)<br>)<br>) |
| *Defendants*. | ) |

## MEMORANDUM OPINION

Before the Court are Defendants Eric Jenkins, Matthew Thomas, Eric Hindmon, and the City of Soddy-Daisy's ("the City") motions for summary judgment (Docs. 73, 82, 88). For the reasons herein, the motions are **GRANTED**.

### I. BACKGROUND

#### A. The Officers

Officer Eric Hindmon is a long-serving police officer who began his career with the Chattanooga Police Department in 2003. (Doc. 76-1, at 22.) He attended a police academy and received his Tennessee Peace Officer Service Training ("POST") certification prior to joining the Chattanooga Police Department. (*Id.*) After leaving the Chattanooga Police Department in 2016, Hindmon briefly worked a logistics job before reentering law enforcement and joining the Soddy-Daisy Police department ("SDPD"). (*Id.* at 23.) Hindmon has maintained his POST certification since he earned it in the early 2000s and has never been involved in an officer

shooting in which he fired his service weapon. (*Id.* at 27, 32.)  Additionally, Hindmon has been trained in crisis-intervention techniques, as well as domestic-assault interdiction. (*Id.* at 34.) Domestic-assault interdictions comprise roughly thirty percent of the calls to which Hindmon responds. (*Id.* at 35.)

Officer Thomas previously received training regarding how to manage individuals with diminished capacity, as well as intoxicated and belligerent individuals. (Doc. 75-1, at 59.)  Prior to this shooting, in his roughly two years of employment with SDPD, he had answered a substantial number of domestic-violence calls. (*Id.* at 60.)  He is also POST certified and completed yearly in-service training on deadly force. (Doc. 76-1, at 54.)  Officer Jenkins, like Officers Thomas and Hindmon, is POST certified and completed required in-service training on the use of deadly force. (*Id.*)  He graduated from the police academy in 2004 and has worked for SDPD for over ten years. (*Id.* at 67.)

### B. The Shooting and its Aftermath

In April 2019, Jack Sawyer, the decedent, was diagnosed with dementia and vascular Alzheimer's disease. (*Id.* at 95; Doc. 74-1, at 6.)  The decedent Jack Sawyer's son, John, helped pay his living expenses, and he co-owned his father's house with Jack's girlfriend, Patti Grimm. (Doc. 74-1, at 40.)  Jack was a proud man, and both Grimm and John worried about his reaction to his diagnosis. (*Id.* at 14.)

Jack previously owned a substantial number of firearms. (*Id*. At 13, 35–36.)  He gave most of these firearms to John but kept a pistol for himself.[1]  (*Id*.)  After moving into a new home, John and Grimm discussed taking the bullets out of Jack's pistol due to concerns about his

---

[1] Grimm testified that it was "common knowledge" that a convicted felon cannot own a firearm. Jack was convicted of felony healthcare fraud in 2009. (Doc. 74-1, at 37–38, 54.)  Nonetheless, Jack kept a single firearm, a Magnum .357 pistol. (*Id.* at 10, 38.)

continuing declining health and mental awareness. (*Id.* at 14, 16, 41.) Grimm ultimately removed the bullets from the weapon and placed them on top of the television cabinet in the house but did not tell Jack about unloading the gun because she did not want to upset him. (*Id.* at 18–19; Doc. 76-1, at 96; Doc. 91-1, at 6.) After removing the bullets, Grimm did not look at the gun again before the night of Jack's shooting. (Doc. 74-1, at 20.) When asked why John and Grimm did not remove the gun from the home, John said that he was worried about frustrating him by taking away a treasured possession. (*Id.* at 42.)

The night of the September 19, 2019, Grimm was getting ready for bed when Jack entered her bedroom and asked her to help him find the remote to his television. (*Id.* at 23.) When Grimm could not find the remote, Jack became upset and started hitting the television with a flashlight. (*Id.* at 24.) Jack eventually said that he would just go to bed, so Grimm turned around to leave the room. (*Id.* at 25.) Immediately after he stated he was going to bed, though, he said he wanted to watch television. (*Id.*) Grimm turned around to reenter Jack's bedroom and saw Jack pointing the pistol at her face about three feet away. (*Id.* at 27.) She immediately ran out of the house. (*Id.*) Prior to this incident, Jack had never been violent towards Grimm. (*Id.* at 15–16.)

After leaving Jack's house, Grimm, upset, drove to her daughter and son-in-law's home. (*Id.* at 25, 28; Doc. 76-1, at 90.) John, who lived in Denver, suggested that they call for a wellness check on Jack. (Doc. 74-1, at 44.) Jason Lyons, Grimm's son-in-law, called the Soddy-Daisy Police Department and told dispatch that there had been a domestic dispute and that Jack was violent. (*Id.* at 50; *911 Call*, at 00:20–40.) Lyons told the Soddy-Daisy police that Jack had "gone crazy." (Doc. 74-1, at 31.) He also informed the SDPD that Jack had a gun but

that it was unloaded. (*Id.* at 51; Doc. 75-1, at 49, 52; Doc. 76-1, at 97; Doc. 91-1, at 27; *Excerpt of Jenkins Body Camera Video* at 0:00–0:05.)

When the SDPD arrived, they attempted to contact Jack by knocking on the front door and ringing the doorbell, but he did not answer. (Doc. 74-1, at 52; Doc. 75-1, at 16; Doc. 76-1, at , 38, 40, 98; *Thomas Body Camera Video*, at 1:50–2:45; *Hamilton Body Camera Video*, at 14:00–14:30.) The officers also attempted calling his phone, which went straight to voicemail. (Doc. 75-1, at 36.) Officers Jenkins and Thomas then entered the home with guns drawn because they had been informed that Jack had a firearm. (*Id.* at 44, 51–52; Doc. 76-1, at 48; Doc. 91-1, at 88; *Thomas Body Camera Video*, at 11:00–12:00.) Officers Jenkins and Thomas loudly called Jack's name while walking towards the back of the house while Officer Hindmon stayed towards the front of the house to guard a locked door. (Doc. 75-1, at 45, 50; Doc. 76-1, at 16–17; *Thomas Body Camera Video*, at 12:00–13:00.) When Officer Jenkins entered the back bedroom, he saw Mr. Sawyer—initially sitting on his bed with his back to the officers—turn around with what appeared to be a pistol in his hand. (Doc. 75-1, at 49–50, 63; Doc. 76-1, at 97; Doc. 91-1, at 53.) Officer Thomas ducked into the bedroom's ensuite bathroom as Jenkins fired two rounds at Jack. (Doc. 75-1, at 50, 56–57; *see Excerpt of Thomas Body Camera Video* 0:00–0:08.) Officer Hindmon did not observe the shots being fired. (Doc. 76-1, at 18.) The bullet entered Jack's chest, lacerated his heart and his left lung, and exited through the left side of his chest, killing him instantly. (Doc. 75-1, at 27, 47.)

When Officer Hindmon heard the shots from the front of the house, he immediately called for an ambulance, checked on the conditions of Officers Thomas and Jenkins, and then checked Jack's wound and for a pulse. (Doc. 76-1, at 17.) After the shooting, Officer Jenkins also took Jack's pulse, and he and Officer Hindmon determined that he was lifeless. (*Id.*; Doc.

75-1, at 40–41; *Thomas Body Camera Video,* at 18:00–19:00.) EMTs declared Jack deceased when they arrived on scene. (Doc. 76-1, at 101.) An investigation conducted by the Hamilton County Sheriff's Office found that Officer Jenkins had probable cause to believe that Jack posed a serious threat of bodily injury or death. (*Id.* at 102.)

In June 2020, John Sawyer brought this action on behalf of his father's estate, asserting claims pursuant to 42 U.S.C. § 1983 against the involved officers—Jenkins, Hindmon, and Thomas—and the City of Soddy-Daisy, in addition to various state-law claims. (Doc. 1.) After amending his complaint, John also asserted various negligence-based claims against Defendants. (Doc. 66.) On April 5, 2022, Officers Jenkins and Thomas filed a motion for summary judgment (Doc. 73). On April 18, 2022, Officer Hindmon filed a motion for summary judgment (Doc. 82), and the City filed its motion for summary judgment thereafter (Doc. 88). John submitted a single response to all the motions (Doc. 91), and the motions are ripe for the Court's review.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court typically views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Because the facts of this case are recorded on the officers' body-cameras, they "are viewed in the video's light, not in a light favorable to plaintiff." *Cunningham v. Shelby Cnty.*, 994 F.3d 761, 765 (6th Cir. 2021).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349

5

Case 1:20-cv-00153-TRM-SKL   Document 95   Filed 06/23/22   Page 5 of 13   PageID #: 2070

F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### III. ANALYSIS

42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights ... secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

All three officers have moved for summary judgment on the basis that they are each entitled to qualified immunity, and the City has moved for summary judgment on the basis that there is no underlying constitutional violation sufficient to support municipal liability under *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). John responds with various arguments

about what the officers should have done in the situation and argues that they are not entitled to summary judgment. (*See* Doc. 91.)

The doctrine of qualified immunity "shields governmental officials from monetary damages as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted). In deciding whether a defendant is entitled to qualified immunity at the summary judgment stage, the Court employs a two-part test, which may be conducted in either order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). First, the Court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012). Second, if a constitutional right was violated, the Court determines whether the right was clearly established at the time the violation occurred. *Id.* The plaintiff bears the burden of "satisfy[ing] both inquires in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480. "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violated the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

### A. Officers Thomas and Jenkins's Motion for Summary Judgment

John argues that the officers acted unlawfully because, at least in part, Jack reasonably believed that the officers were intruders in his home. (Doc. 91, at 20–21.) In this case, the right at issue is an individual's Fourth Amendment right to be free from unreasonable search and seizure. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 399 (6th Cir. 2022). Otherwise, valid seizures "can become 'unreasonable' under the Fourth Amendment if the officers use excessive force to carry them out." *Id.* at 400 (citing *Graham v. Connor*, 490 U.S. 386, 394–97 (1989)). When

officers have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable" to use deadly force. *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "We must judge the reasonableness of the use of force from the perspective of a reasonable officer on the scene and not through the lens of 20/20 hindsight, allowing for the fact that police officers are often forced to make split-second judgment—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 765–66 (6th Cir. 2015). The Sixth Circuit has previously held that "within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Id*. at 767.

Officers Jenkins and Thomas called out to Jack when they entered the bedroom. As soon as Jack turned around, Officer Jenkins saw the pistol in his hand and told him to drop it. It is undisputed that Jack had the gun in his hands when he turned around. (Doc. 91, at 13.) Despite Officer Jenkins' command, Jack did not immediately react. When Officer Jenkins fired his service weapon at Jack, he reasonably believed that he and Officer Thomas were in imminent danger of being shot and wounded or killed. The officers were in Jack's house because he had pointed the same gun at Grimm, which only bolsters the officers' reasonableness in believing they were in danger. *See Whitlow v. City of Louisville*, 39 F. App'x 297, 306 (6th Cir. 2002). While Grimm allegedly informed the officers that the gun was unloaded, it was not unreasonable to believe that Jack could have reloaded the gun or located the ammunition that was still in the home. *See Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) (reversing denial of qualified immunity in case where suspect approached officers with a knife and did not respond to

commands to drop the weapon). And while John contends that Jack's reaction was reasonable, the Court's inquiry is focused on the officers' reasonable beliefs, not the plaintiff's belief or the reasonableness thereof. *Mullins*, 805 F.3d at 765–66. Consequently, Officers Jenkins and Thomas are entitled to qualified immunity, and their motion for summary judgment will be **GRANTED**.

> B. **Officer Hindmon's Motion for Summary Judgment**

John claims that Officer Hindmon violated his duty to intervene and prevent Officer Jenkins's improper use of deadly force, and, as a result, violated Jack's Fourth Amendment rights.[2] Generally, "[s]ection 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020). However, the Sixth Circuit has held that failure to intervene to stop a constitutional violation may give rise to liability. *Id*. at 493. "This theory requires a plaintiff to establish that: (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id*. (quoting *Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019) (internal quotation marks omitted)).

In this case, Hindmon did not observe the use of deadly force and did not have the opportunity or means to prevent it from occurring. While Jenkins and Thomas were walking

---

[2] The Court has already found that there was no unconstitutional use of deadly force in this case, and, for that reason alone, there was no constitutional violation for Hindmon to prevent and he is entitled to summary judgment. To the extent John asserts a failure-to-intervene claim against Officer Thomas, it also fails for lack of an underlying constitutional violation. *See* Section III.A, *supra*. Nevertheless, even if there had been a constitutional violation, Hindmon is entitled to summary judgment because John cannot show that Hindmon neglected a duty to intervene. The same is true for Thomas, who, although closer to the shooting, did not have time to stop Jenkins from firing, as it occurred just a second or two following the door being opened.

9
Case 1:20-cv-00153-TRM-SKL   Document 95   Filed 06/23/22   Page 9 of 13   PageID #: 2074

towards the back of the house, Hindmon stayed near the front and guarded a locked door. (Doc. 75-1, at 45, 50; Doc. 76-1, at 16–17; *Thomas Body Camera Video*, at 12:00–13:00.) Less than eight seconds later, Jack had been shot. (*See Excerpt of Thomas Body Camera Video* at 0:00–0:08.) Eight seconds is not enough time for Hindmon to have perceived the potential for deadly force—he did not even know where Jack was in the house—and to have intervened to stop Jenkins from firing his weapon at Jack, which occurred immediately after Jenkins and Thomas entered the back bedroom. *See Burgess v. Fischer*, 735 F.3d 462, 475–76 (6th Cir. 2013) (holding that an incident must last long enough for an officer to "perceive what was going on and intercede to stop it"); *see also Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (6th Cir. 2007) (determining that an officer did not have sufficient time to intervene when he had a "six-or-seven second window" to perceive the incident and act). Accordingly, John has not established a genuine dispute of material fact as to whether Hindmon had time to intervene, and Hindmon's motion for summary judgment will be granted as to the failure-to-intervene claim.

Hindmon also asserts that he is entitled to summary judgment on John's failure-to-render-medical-care claim, an alleged Fourteenth Amendment violation. (Doc. 83, at 14–15.) The Fourteenth Amendment requires "adequate medical care for persons injured while being apprehended by police." *Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020) (citation omitted). "An injured suspect, however, is only entitled to relief if a government official acts with deliberate indifference to his serious medical needs." *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotation marks omitted). "When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018).

In this case, after hearing gunshots, Hindmon immediately called for an ambulance. (Doc. 76-1, at 17.) He followed up with dispatch and gave them additional details, telling them an ambulance was needed as soon as possible. (*Id.*) When the ambulance arrived, however, Jack was already dead—it is likely that he died instantaneously—and Hindmon had not rendered further aid because Jack had no pulse when Hindmon checked. (Doc. 75-1, at 27, 47.) These facts are nearly identical those in *Wilkerson v. City of Akron*, in which the Sixth Circuit affirmed the grant of qualified immunity to officers after they called for an ambulance and encouraged the ambulance to come more quickly. *See* 906 F.3d at 483. In that case, like this one, the officers were the source of deadly force that killed the plaintiff. *Id.*; *see also Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1098 (6th Cir. 1992) (grant of qualified immunity appropriate for jail guards who cut down prisoner who had hung himself in jail cell and called paramedics but rendered no further aid). Accordingly, the Court will **GRANT** Hindmon's motion for summary judgment in its entirety.

C. **The City's Motion for Summary Judgment**

The City argues that it is entitled to summary judgment because there is no underlying constitutional violation to support municipal § 1983 liability. The Supreme Court has held that municipalities and other local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. A municipality cannot be held liable under *Monell* unless there is an underlying constitutional violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). In this case, the Court has already determined that no

11
Case 1:20-cv-00153-TRM-SKL     Document 95     Filed 06/23/22     Page 11 of 13     PageID #: 2076

underlying constitutional violations occurred. As a result, the City is entitled to summary judgment, and its motion will be **GRANTED**.

Finally, the City has moved for summary judgment on John's various state-law claims. (*See* Doc. 66, at 33–40.) While Tennessee governmental entities generally enjoy sovereign immunity against suit, the Tennessee Governmental Tort Liability Act ("GTLA") "waived in part the immunity previously afforded to governmental entities" for "injury proximately caused by a negligent act or omission of any employee acting within the scope of . . . employment[.]" *Sallee v. Barrett*, 171 S.W.3d 822, 826 (Tenn. 2005) (internal quotation marks omitted) (quoting Tenn. Code Ann. § 29-20-205)). "Where immunity has been waived, such as for the negligent acts of governmental employees, the governmental entity is the proper party-defendant" while "the employee is, by statute, immune from suit." *Id.* (citing Tenn. Code Ann. § 29-30-310(b)). Under these circumstances, Tennessee circuit courts have "exclusive original jurisdiction" and "shall hear and decide such suits without the intervention of a jury." Tenn. Code Ann. § 29-20-307.[3]

The statute, however, preserves governmental immunity for certain types of actions, including suits for violations of civil rights. *See Allred v. Rodriguez*, 399 F. Supp. 3d 730, 733 (W.D. Tenn. 2019) (citing Tenn. Code Ann. § 29-20-201(a)). Where the same circumstances give rise to the state-law and § 1983 claims, the state-law claims are barred by the GTLA. *See id.* (citing *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010)). The facts underlying John's § 1983 and state-law claims are the same. As a result, GTLA bars John's state-law claims

---

[3] An exception to the no-jury provision is provided in suits with multiple defendants, one or more of whom are government entities or employees thereof subject to the GTLA, and one or more of whom are not. *See* Tenn. Code Ann. § 29-20-313(b). All Defendants in this action are governmental entities or employees thereof.

against the City and the individual officers. The City is therefore entitled to summary judgment on these claims, and its motion will be **GRANTED**.

IV. **CONCLUSION**

For the above reasons, Officers Jenkins and Thomas's motion for summary judgment (Doc. 73), Officer Hindmon's motion for summary judgment (Doc. 82), and the City's motion for summary judgment (Doc. 88) are **GRANTED**.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**